UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

MEDICOMP, INC.,

              Plaintiff,

v.                                       Case No:  6:14-cv-1848-Orl-28DAB

SECRETARY, UNITED STATES
DEPARTMENT OF HEALTH AND
HUMAN SERVICES,

              Defendant.

## ORDER

In this appeal pursuant to 42 U.S.C. § 1395ff, Plaintiff Medicomp, Inc. challenges the final decision of the Secretary of the United States Department of Health and Human Services ("the Secretary") denying reimbursement on sixteen claims for payment under Medicare.[1]  As set forth below, the decision of the Secretary is affirmed.

### I.    Background

The Medicare Act, which is Title XVIII of the Social Security Act, "establishes a federally subsidized health insurance program to be administered by the Secretary." Heckler v. Ringer, 466 U.S. 602, 605 (1984).  The Secretary administers the Medicare program through the Center for Medicare and Medicaid Services ("CMS").  CMS, in turn, contracts with private entities called Medicare Administrative Contractors ("Contractors")

---

[1] See 42 U.S.C. § 1395ff(b)(1)(A) (providing for judicial review of final decisions of the Secretary as provided in 42 U.S.C. § 405(g)); id. § 405(g) (providing for review through filing of a civil action in district court).  Citations to the administrative record, which has been filed under seal, are indicated by "A.R." followed by the page number(s).

to assist it with administration of the program. Healthcare providers and suppliers submit their claims for reimbursement under Medicare to the Contractor in their region. The Contractor then determines whether the services provided are covered by Medicare; if so, the Contractor reimburses the provider or supplier.

Plaintiff is a supplier of remote cardiac monitoring services.[2] Remote cardiac monitoring is a methodology for ascertaining whether or not a patient's symptoms correlate with cardiac arrhythmia—a rapid or slow heart rate—and it enables cardiologists to determine what happens after a patient leaves the examination room. When a physician orders Plaintiff's monitoring services for a patient, Plaintiff receives a prescription from the physician either through an online enrollment or by facsimile indicating that the patient is being hooked up to one of Plaintiff's cardiac event monitors at the physician's office. Physicians and patients throughout the country order and receive Plaintiff's services, but Plaintiff is located in Florida.

With regard to each of the claims for payment at issue in this case, a cardiac event monitor designed by Plaintiff called the "Cardio-PAL[3] SAVI" was ordered by a physician and worn by a patient for up to thirty days. The monitor, which is a type of device known as a "memory loop recorder" that is the size of a cellular telephone, attaches to the patient's waist, and three electrodes are attached to the patient's chest. The device automatically records any heartrate that is "clinically significant"—slow, fast, or irregular. Additionally, if

---

[2] There is no dispute in this case as to the nature of Plaintiff's services or the manner in which Plaintiff provided those services. The description in the text of Plaintiff's services is included for background purposes and is taken from the testimony of Plaintiff's witnesses at a hearing before an administrative law judge ("ALJ") in 2012. (See Tr. of Apr. 3, 2012 ALJ Hr'g, A.R. 001162—001230).

[3] PAL stands for "Personal Arrhythmia Logger."

the patient notices symptoms, the patient can trigger the device to record the heartrate at a particular moment. The device informs the patient when it is time to call the cardiac monitoring center. The patient then contacts a technician at Plaintiff's monitoring center in Melbourne, Florida, and places the device next to the mouthpiece of a landline telephone. The device emits a series of tones that are decoded back into electrocardiogram (EKG) wave form at the monitoring center, and Plaintiff's technicians examine the EKG. Plaintiff then produces a report and forwards it to the ordering physician.

Plaintiff participates in the Medicare program as an Independent Diagnostic Testing Facility ("IDTF").[4] When Plaintiff provides cardiac monitoring services to a Medicare beneficiary, Plaintiff submits a Medicare claim for payment for use of the event monitor for up to thirty days and preparation of the report that it provides to the physician. At all times relevant to this case, the Contractor for Florida—to whom Plaintiff was required to submit its claims for payment under Medicare—was First Coast Service Options, Inc. ("First Coast"). In 2011, First Coast denied twenty-seven of Plaintiff's claims with dates of service in 2009 and 2010, concluding that the documentation submitted by Plaintiff in support of those claims did not establish that the cardiac monitoring services that Plaintiff provided to those twenty-seven Medicare beneficiaries were medically necessary as required for Medicare payment.

After First Coast again denied those twenty-seven claims upon a request by Plaintiff for redetermination, Plaintiff appealed the denials through three levels of administrative review, including review by an administrative law judge ("ALJ") and by the Medicare

---

[4] See generally 42 C.F.R. § 410.33 (regarding IDTFs).

Appeals Council ("the Council").[5]  After the decision of the Council, sixteen of Plaintiff's

claims remain denied.[6]  Plaintiff now seeks judicial review of the Council's ruling on those

sixteen claims, which is regarded as the final decision of the Secretary.

## II.   Standard of Review

This appeal is brought pursuant to 42 U.S.C. § 1395ff, which provides for "judicial

review of the Secretary's final decision . . . as is provided in section 405(g) of [Title 42],"

with the proviso that "any reference to the 'Commissioner of Social Security' or the 'Social

Security Administration' in subsection (g) . . . of section 405 . . . shall be considered a

reference to the 'Secretary' or the 'Department of Health and Human Services,'

respectively."  42 U.S.C. § 1395ff(b)(1)(A).  In other words, once the Secretary renders a

final decision on a Medicare claim, judicial review is available "in the same manner as is

provided in 42 U.S.C. § 405(g) for old age and disability claims arising under Title II of the

Social Security Act."  Ringer, 466 U.S. at 605 (footnote omitted).  "Pursuant to 42 U.S.C. §

405(g), judicial review of the Secretary's decision regarding a claim for Medicare benefits

is limited to 'whether there is substantial evidence to support the findings of the . . .

[Secretary], and whether the correct legal standards were applied.'"  Gulfcoast Med.

Supply, Inc. v. Sec'y, Dep't of Health & Human Servs., 468 F.3d 1347, 1350 n.3 (11th Cir.

---

[5] As the Supreme Court explained in Ringer, the Secretary's decision is not final until a claimant "has pressed his claim through all designated levels of administrative review."  466 U.S. at 606.  In this case, these levels included:  an initial decision and redetermination by First Coast; reconsideration by a Qualified Independent Contractor, Q[2] Administrators; de novo review by an administrative law judge ("ALJ"); and appeal to the Council, which reviews de novo the ALJ's decision.

[6] Eleven of Plaintiff's twenty-seven denied claims were approved at one stage or another of the review process, leaving only sixteen at issue here.  The Council affirmed the ALJ's denial decision as to all sixteen claims, though it modified the ALJ's rationale as to three of the sixteen.

2006) (alterations in original) (quoting <u>Wilson v. Barnhart</u>, 284 F.3d 1219, 1221 (11th Cir. 2002)).[7]

## III. Discussion

In denying payment for the sixteen claims at issue, the Secretary determined that the documentation submitted by Plaintiff did not establish that the services provided to the sixteen Medicare beneficiaries were "reasonable and necessary for the diagnosis and treatment of illness or injury" as required for Medicare payment. The Secretary applied documentation requirements that are contained in a Local Coverage Determination ("LCD")

---

[7] Plaintiff puts forth Administrative Procedure Act ("APA") standards of review in its briefs, (<u>see, e.g.</u>, Doc. 28 at 8-9), and asserts that the Secretary's "decision is arbitrary, capricious, an abuse of discretion, contrary to law, and unsupported by substantial evidence, in violation of the [APA]," (<u>id.</u> at 2). However, the Eleventh Circuit cases cited by Plaintiff in support of its assertion of APA standards of review involved appeals under a different section of the Medicare Act—42 U.S.C. § 1395oo—rather than § 1395ff as in the instant case. See <u>Sarasota Mem'l Hosp. v. Shalala</u>, 60 F.3d 1507, 1510-11 (11th Cir. 1995); <u>Charter Peachford Hosp., Inc. v. Bowen</u>, 803 F.2d 1541, 1543 (11th Cir. 1986); <u>Lloyd Noland Hosp. & Clinic v. Heckler</u>, 762 F.2d 1561, 1565 (11th Cir. 1985).

As stated in the text, § 1395ff(b)(1)(A) specifically provides for judicial review as provided in 42 U.S.C. § 405(g). On the other hand, § 1395oo(f)(1)—though also providing for judicial review in a federal district court—provides that cases are to "be tried pursuant to the applicable provisions under chapter 7 of Title 5 notwithstanding any other provisions in section 405 of [Title 42]." The APA is codified in Title 5, and chapter 7 of Title 5 contains the APA's judicial review provisions, including those pertaining to "scope of review." <u>See, e.g.</u>, 5 U.S.C. § 706(2)(A) (providing that reviewing courts shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law").

Plaintiff's reliance on APA review standards is misplaced. This appeal is provided for by 42 U.S.C. § 1395ff, which, unlike § 1395oo, incorporates the review provisions of 42 U.S.C. § 405(g)—not those of the APA. This Court reviews the Secretary's decision to determine "whether there is substantial evidence to support the findings of the . . . [Secretary], and whether the correct legal standards were applied." <u>Gulfcoast Med. Supply</u>, 468 F.3d at 1350 n.3 (alterations in original) (internal quotation omitted); <u>accord</u> <u>Estate of Morris v. Shalala</u>, 207 F.3d 744, 745 (5th Cir. 2000) (rejecting the appellant's argument that APA standard of review applied, distinguishing a case brought under 42 U.S.C. § 1395oo, and concluding that "[t]he 405(g) standard controls" in a case brought under § 1395ff(b)). <u>But see</u> <u>Almy v. Sebelius</u>, 679 F.3d 297, 301-02 (4th Cir. 2012) (setting forth both § 405(g) and APA standards of review in an appeal under § 1395ff).

issued by First Coast. Plaintiff contends that the Secretary erred in relying on the LCD, and Plaintiff maintains that it submitted all the documentation that it was required under Medicare to submit to establish medical necessity. As set forth below, the Secretary applied the correct legal standards and the Secretary's findings are supported by substantial evidence. Accordingly, the Secretary's decision is due to be affirmed under 42 U.S.C. § 1395ff(b)(1)(A), which incorporates by reference 42 U.S.C. § 405(g).[8]

Under Medicare, "no payment may be made . . . for any expenses incurred for items or services . . . [that] are not reasonable and necessary for the diagnosis and treatment of illness or injury." 42 U.S.C. § 1395y(a)(1)(A). Moreover, "[n]o payment shall be made to any provider of services . . . unless there has been furnished such information as may be necessary in order to determine the amounts due such provider." Id. § 1395*l*(e); see also 42 C.F.R. § 424.5(a)(6) (providing that "[a]s a basis for Medicare payment . . . [t]he provider . . . must furnish to the [Contractor] sufficient information to determine whether payment is due").

"The Medicare Act authorizes the Secretary to determine what claims are covered by the Act 'in accordance with the regulations prescribed by him.'" Ringer, 466 U.S. at 605 (quoting 42 U.S.C. § 1395ff(a)). In addition to the regulations the Secretary prescribes, the Secretary provides coverage instruction through policy manuals[9] and other guidance. The Secretary may, through CMS, issue a National Coverage Determination ("NCD")—"a

---

[8] Moreover, even if the APA review standards proposed by Plaintiff applied here, the Secretary's decision was not arbitrary, capricious, an abuse of discretion, or contrary to law.

[9] Such manuals include the Medicare Claims Processing Manual and the Medicare Program Integrity Manual.

determination by the Secretary with respect to whether or not a particular item or service is covered nationally."  42 U.S.C. § 1395ff(1)(B).  Additionally, First Coast, like other Contractors, is permitted to issue LCDs—"determination[s] by a [Contractor] . . . respecting whether or not a particular item or service is covered on a [Contractor]-wide basis . . ., in accordance with [42 U.S.C. §] 1395y(a)(1)(A)."  Id. § 1395ff(f)(2)(B); accord Medicare Program Integrity Manual § 13.1.3 (defining LCD as "a decision by a [Contractor] . . . whether to cover a particular item or service on a [Contractor]-wide basis in accordance with [42 U.S.C. § 1395y(a)(1)(A)] (i.e., a determination as to whether the item or service is reasonable and necessary).").

NCDs are binding on all Contractors, ALJs, and the Council.  42 C.F.R. § 405.1060(a)(4).  And, in deciding claim appeals, neither an ALJ nor the Council may "disregard, set aside, or otherwise review an NCD," id. § 405.1060(b)(1) & (c)(1), though they "may review the facts of a particular case to determine whether an NCD applies to a specific claim for benefits and, if so, whether the NCD was applied correctly to the claim," id. § 405.1060(b)(2) & (c)(2).  On the other hand, "ALJs and the [Council] are not bound by LCDs . . . but will give substantial deference to [them] if they are applicable to a particular case."  Id. § 405.1062(a).[10]  "An ALJ or [the Council] may not set aside or review the validity of an . . . LCD for purposes of a claim appeal."  Id. § 405.1062(c).

Plaintiff's primary argument is that the Secretary's decision ignored an NCD issued by CMS—NCD 20.15—and instead erroneously relied on an LCD issued by First Coast—

---

[10] But, "[i]f an ALJ or [the Council] declines to follow [an LCD] in a particular case, the ALJ or [Council] decision must explain the reasons why the [LCD] was not followed."  42 C.F.R. § 405.1062(b).

LCD L29253. Plaintiff contends that NCD 20.15 required Medicare reimbursement for the remote cardiac monitoring services at issue and that LCD L29253 is impermissibly more restrictive than, and in conflict with, NCD 20.15. The Secretary, on the other hand, maintains that LCD L29253 is consistent with NCD 20.15 and was properly applied here. Additionally, the Secretary asserts that Plaintiff is attempting to mount a challenge to the validity and enforceability of the LCD—a challenge that is not appropriate in the context of review of a denied claim for payment. The Court agrees with the Secretary on these points.

NCD 20.15, which pertains to EKG services and went into effect in 2004, explains:

> Ambulatory electrocardiography (AECG) refers to services rendered in an outpatient setting over a specified period of time, generally while a patient is engaged in daily activities, including sleep. **AECG devices are intended to provide the physician with documented episodes of arrhythmia, which may not be detected using a standard 12-lead EKG.** AECG is most typically used to evaluate symptoms that may correlate with intermittent cardiac arrhythmias and/or myocardial ischemia. **Such symptoms include syncope, dizziness, chest pain, palpitations, or shortness of breath. Additionally, AECG is used to evaluate patient response to initiation, revision, or discontinuation of arrhythmic drug therapy.**

NCD 20.15 at 1 (emphasis added). The NCD then provides that certain indications "are covered nationally," including:

> Transtelephonic EKG transmissions . . . as a diagnostic service for the indications described below, when performed with equipment meeting the standards described below, subject to the limitations and conditions specified below. . . . Covered uses are to:
>
> **a.    Detect, characterize, and document symptomatic transient arrhythmias;**
>
> **b.  Initiate, revise, or discontinue arrhythmic drug therapy; or,**
>
> **c.  Carry out early post-hospital monitoring of patients discharged after myocardial infarction . . . .**
>
> Certain uses other than those specified above may be covered if, in the judgment of the local [Contractor], such use is medically necessary.

NCD 20.15 at 2 (emphasis added). The NCD also provides that certain indications not relevant here "are non-covered nationally unless otherwise specified." NCD 20.15 at 3. The NCD concludes by stating that "[a]mbulatory cardiac monitoring performed with a marketed, FDA-approved device[] is eligible for coverage if it can be categorized according to the framework" provided in the NCD and that "[u]nless there is a specific NCD for that device or service, determination as to whether a device or service that fits into the framework is reasonable and necessary is according to local [Contractor] discretion." Id.

LCD L29253, titled "Patient Demand Single or Multiple Event Recorder"—went into effect for services performed on or after February 2, 2009. (LCD L29253 at 2). The LCD provides in part:

> Medicare will consider the use of patient demand single or multiple event recorders medically reasonable and necessary under the following circumstances:
>
> - The patient demand single or multiple event recorder is utilized to detect, characterize, and document symptomatic transient arrhythmias.
>
> - A definitive diagnosis has not been made after all of the following conditions have been met:
>
>   **The patient has undergone a complete history and physical by a physician prior to the initiation of monitoring. The history and physical must indicate that the patient is experiencing recurrent, transient symptoms suggestive of cardiac arrhythmia.** Note: Palpitations are extremely common in healthy individuals. Therefore if ICD-9 code 785.1 (Palpitations) is billed as the diagnosis supporting medical necessity, the history and physical or other pertinent medical record documentation must support the presence of associated symptoms such as dizziness, shortness of breath, chest discomfort, or an underlying history of cardiac disease; and
>
>   **The patient has undergone a 12-lead EKG and rhythm strip.**
>
> - A physician overseeing the medical management of the patient orders the medically necessary patient event recorder.

LCD L29253 at 3.[11]  LCD L29253 also lists three "ICD-9 Codes that Support Medical

Necessity"—780.2 (Syncope and Collapse), 780.4 (Dizziness and Giddiness), and 785.1

(Palpitations). Id. at 6.

Finally, LCD L29253 provides "Documentation Requirements":

**Medical record documentation maintained by the ordering/referring physician/nonphysician practitioner (e.g., complete history and physical, 12 lead EKG, and rhythm strip performed prior to initiation of the patient demand event recorder)** must indicate the medical necessity for use of the patient demand single or multiple use event recorder. If ICD-9 code 785.1 (Palpitations) is the diagnosis billed, the history and physical or other pertinent medical record documentation must support the presence of associated symptoms such as dizziness, shortness of breath, chest discomfort, or an underlying history of cardiac disease.

**If the provider of the service is other than the ordering/referring physician/nonphysician practitioner, the order must state the indication/medical necessity for the patient demand event recorder, and the provider of the service is responsible for ensuring that all of the necessary coverage criteria have been met prior to the initiation of the patient demand event recorder.**

The EKG rhythm strip transmission and interpretation must include the following information:  the name of the patient, the presenting diagnosis, the time and date of the transmission, the lead of the EKG transmission, the PR interval, the QRS interval, the rate, the rhythm, the signature of the person interpreting the EKG strip, cardiovascular symptomatology reported by the patient at the time of the transmission, any necessary actions (e.g., notification of physician, emergency instructions given to patient, etc.) taken by the person interpreting the EKG rhythm strip.

Id. at 7 (emphasis added).

## A.    Alleged Inconsistency Between NCD 20.15 and LCD L29253

Relying on LCD L29253, the Secretary denied the sixteen claims at issue for

reasons that included:  lack of documentation of a pre-service traditional EKG; lack of

---

[11] Other requisite circumstances listed in LCD L29253 are not at issue here. See LCD L29253 at 3-4.

documentation of an EKG rhythm strip; lack of documentation of a complete history and physical; and lack of documentation reflecting that the patient was experiencing "recurrent transient symptoms suggestive of cardiac arrhythmia."  Plaintiff argues that each of these four denial bases conflicts "with the Medicare payment criteria in NCD 20.15." (Doc. 28 at 10).[12]

Plaintiff contends that the requirement of documentation of a pre-service EKG and EKG rhythm strip is inconsistent with the "clinical rationale"[13] and statement in NCD 20.15 that episodes of arrhythmia "may not be detected using a standard 12-lead EKG." However, the fact that NCD 20.15 notes the fact that an arrhythmia might not show up on a standard EKG does not render L29253's requirement of documentation of a pre-service EKG inconsistent with NCD 20.15.

Next, Plaintiff asserts that requirements regarding documentation of a complete history and physical indicating that the patient was experiencing "recurrent, transient symptoms suggestive of cardiac arrhythmia" do not account for other uses authorized in NCD 20.15.  Plaintiff is correct that NCD 20.15 lists three covered uses: (1) to "[d]etect, characterize, and document symptomatic transient arrhythmias"; (2) to "[i]nitiate, revise, or discontinue arrhythmic drug therapy"; and (3) to "[c]arry out early post-hospital monitoring of patients discharged after myocardial infarction."  Plaintiff argues that the requirement of documentation of a history and physical indicating symptoms is inconsistent with the second and third covered uses listed in NCD 20.15, and relatedly, Plaintiff contends that

_____

[12] For some claims, other denial reasons were also given, but in its inconsistency argument Plaintiff challenges only the denial reasons noted in the text. (See Doc. 28 at 9-10).

[13] (Doc. 28 at 13).

LCD L29253 limits payment to only the first covered use.

However, the other two uses are not germane to this case, and Plaintiff's attempt to rely on this asserted flaw in the LCD therefore misses the mark. None of the sixteen claims at issue involved the second or third listed covered use in NCD 20.15. On the contrary, each of the claims involved diagnoses—palpitations, syncope and collapse, or dizziness and giddiness—that suggest "recurrent, transient symptoms suggestive of cardiac arrhythmia."[14] Moreover, where the records for one beneficiary did—despite reflecting a diagnosis of "palpitations"—seem to suggest the arrhythmic drug therapy use, the Council disagreed with the ALJ's rationale and held that the claim would not be denied based on lack of arrhythmic episodes. (A.R. 000025).[15] In sum, Plaintiff is making an argument that does not apply to any claim denial at issue here, and in any event the Council recognized and applied NCD 20.15's provision that drug therapy evaluation is a covered use.

The Court agrees with the Secretary's contention that Plaintiff is attempting, in this appeal of denied claims, to mount a challenge to the validity of LCD L29253. As earlier noted, neither "[a]n ALJ or [the Council] may . . . set aside or review the validity of an . . . LCD for purposes of a claim appeal." 42 C.F.R. § 405.1062(c). The Medicare regulations do provide a process for a challenge to an LCD, but that procedure was not before the Secretary below and is not before this Court on appeal.

As set forth in the regulations, "[a]n ALJ or the [Departmental Appeals Board] may

_____

[14] Defendant notes in its papers that "Plaintiff has not argued that any of the denied claims were for one of [the other two] uses." (Doc. 29 at 17 n.12). Plaintiff did not respond to this contention in its reply, and Defendant is correct on this point.

[15] The Council nevertheless upheld denial of that claim based on other missing documentation. (A.R. 000026).

review or set aside an LCD . . . in accordance with part 426 of" Title 42. Id. "LCD . . . reviews are distinct from the claims appeal processes . . . ." Id. § 426.310(a). The procedure for a challenge to an LCD involves the filing of an LCD complaint and an ALJ "review of a challenged provision (or provisions) of an LCD using the reasonableness standard." Id. § 426.300(a); see also id. § 426.400 (providing the "[p]rocedure for filing an acceptable complaint concerning a provision (or provisions) of an LCD"). "Contractors develop LCDs by considering medical literature, the advice of local medical societies and medical consultants, public comments, and comments from the provider community." Medicare Program Integrity Manual § 13.1.3. In an LCD review proceeding, medical evidence that was before the Contractor when the LCD was formulated is relevant, and the complainant may present scientific evidence of its own. See 42 C.F.R. §§ 426.417-.418.

Moreover, "[o]nly an aggrieved party may initiate a review of an LCD." Id. § 426.320(a). An "aggrieved party" is defined as a Medicare beneficiary or the estate of a Medicare beneficiary, id. § 426.110; it does not include Medicare providers such as Plaintiff, and attempts to assign rights to request review are not recognized as valid, id. § 426.320(b). In its brief, Plaintiff states that it "acknowledges that given its status as a provider, it cannot invalidate LCD L29253, and it is not attempting to do so in this proceeding." (Doc. 28 at 13 n.3). But, Plaintiff maintains that this limitation "does not preclude [Plaintiff] from challenging the final agency decision on the ground that the Council improperly applied LCD L29253 to trump NCD 20.15." (Id.).

Contrary to its assertions, however, Plaintiff is indeed attempting to challenge the validity of the LCD. Plaintiff's counsel specifically made an invalidity argument before the ALJ. (See, e.g., A.R. 001180 ("So both in terms of enforceability, but also in practicality,

the LCD by First Coast is not enforceable, and that's what we respectfully request that you decide."). Although Plaintiff now claims that it is not attempting to challenge the LCD's validity, Plaintiff's filings in this Court belie this assertion. For example, Plaintiff cites cardiologist testimony it presented before the ALJ regarding the necessity *vel non* of a pre-service EKG test. (See Doc. 28 at 10). That type of testimony is "[c]linical or scientific evidence" that Plaintiff is presenting in an effort to "show[] that the LCD is not reasonable," 42 C.F.R. § 426.400(c)(6)—the type of evidence that belongs in an LCD challenge proceeding rather than a claim appeal. Additionally, Plaintiff argues that "the Council did not consider the uncontroverted administrative record demonstrating the clinical limitations of standard 12-lead EKGs." (Doc. 28 at 13). Again, this is a reference to the cardiologist testimony that was presented in the validity attack presented to the ALJ.

In sum, as did the Secretary, the Court rejects Plaintiff's contention that LCD L29253 conflicts with, or imposes requirements inconsistent with, NCD 20.15. The NCD provides that a device within its framework is "eligible" for coverage. The LCD is more specific than the NCD, applies to the devices and services that Plaintiff provided, and identifies the conditions under which such services are reasonable and necessary. The LCD also sets forth documentation requirements. Although Plaintiff asserts that "[a]n NCD declares a particular item or service to be medically necessary," (Doc. 32 at 3 n.1), and that NCD 20.15 "requires Medicare reimbursement for the remote cardiac monitoring services provided by" Plaintiff, (Doc. 28 at 2), obviously an item or service is not medically necessary for all patients, in all circumstances. The LCD informs providers what medical documentation is required to support a particular claim for payment, and it does not conflict with the NCD in doing so. As the Secretary aptly states in her brief, "[t]his case does not

involve whether Plaintiff's device is a 'covered' device, but whether the documentation of individual services provided to certain Medicare beneficiaries is sufficient to pay the claim." (Doc. 29 at 16). The Council did not "apply LCD L29253 to trump NCD 20.15"; these items of policy guidance are not inconsistent or in conflict in any respect that is germane to this appeal.

### B.    Required Documentation

Next, Plaintiff argues that the Secretary imposed documentation requirements on it that do not exist—even in the LCD. Plaintiff contends that the Secretary erroneously concluded that the LCD required Plaintiff—rather than the ordering physician—to provide the documentation at issue. Plaintiff asserts that in order to establish medical necessity, it is only required to provide to First Coast a physician's written order for cardiac monitoring and a report of its service. The Court is not persuaded that the Secretary erred in its interpretation of the LCD, nor does the Court find merit to Plaintiff's argument that the LCD otherwise imposes impermissible documentation requirements.

The LCD portion at issue provides:

> Medical record documentation maintained by the ordering/referring physician/nonphysician practitioner (e.g., complete history and physical, 12 lead EKG, and rhythm strip performed prior to initiation of the patient demand event recorder) must indicate the medical necessity for use of the patient demand single or multiple use event recorder. . . .

> If the provider of the service is other than the ordering/referring physician/nonphysician practitioner, the order must state the indication/medical necessity for the patient demand event recorder, and the provider of the service is responsible for ensuring that all of the necessary coverage criteria have been met prior to the initiation of the patient demand event recorder.

LCD L29253 at 7, quoted in Doc. 28 at 14. Plaintiff contends that the Council "interpreted [this] excerpt . . . to require [Plaintiff] to retrieve medical records that [Plaintiff] did not create,

does not possess, and cannot legally compel the third party to disclose." (Doc. 28 at 14). In Plaintiff's view, this portion of the LCD is directed not at IDTFs like Plaintiff but at ordering physicians within First Coast's jurisdiction. Additionally, Plaintiff argues that the only documentation requirements for IDTFs are contained in 42 C.F.R. § 410.33, which is titled "Ordering of tests" and provides that "[a]ll procedures performed by the IDTF must be specifically ordered in writing by the physician who is treating the beneficiary" and that "[t]he order must specify the diagnosis or other basis for the testing." 42 C.F.R. § 410.33(d).

In its decision, the Council specifically considered and rejected Plaintiff's argument regarding the fact that it was not in possession of the documents at issue. (See A.R. 000016-000017). The Council concluded that, consistent with 42 U.S.C. §§ 1395y(a)(1)(A)[16] & 1395l(e)[17] and 42 C.F.R. § 424.5(a)(6),[18] the LCD "ultimately burdens the claimant provider of the service, as opposed to the ordering or referring practitioner, to produce the requisite documentation." (A.R. 000017). The Council noted that the LCD—in the portion quoted above—plainly states that "[i]f the provider of the service is other than the ordering/referring physician . . . the provider of the service is responsible for ensuring that all of the necessary coverage criteria have been met prior to the initiation of the patient demand event recorder." This refutes Plaintiff's argument that the directive regarding

---

[16] "[N]o payment may be made . . . for any expenses incurred for items or services . . . [that] are not reasonable and necessary for the diagnosis and treatment of illness or injury."

[17] "No payment shall be made to any provider of services . . . unless there has been furnished such information as may be necessary in order to determine the amounts due such provider . . . ."

[18] "As a basis for Medicare payment . . . [t]he provider . . . must furnish to the [Contractor] sufficient information to determine whether payment is due . . . ."

providing documentation is aimed at ordering physicians rather than the claimant IDTFs themselves. Additionally, the Council noted that in other contexts, such as x-ray, laboratory, and diagnostic tests involving providers similar to IDTFs, CMS has also required those providers to provide documentation in the possession of referring physicians. (See A.R. 000017). The Council also noted the decision of the Court of Appeals for the Ninth Circuit in KGV Easy Leasing Corp. v. Leavitt, 413 F. App'x 966 (9th Cir. 2011), which upheld a claim denial that was based on the failure of an IDTF to provide such documentation.

The Court finds no error in the Secretary's interpretation of the LCD's documentation requirements. Courts have upheld and applied LCD-imposed documentation requirements to other types of providers. See, e.g., Clinic Res. Mgmt. v. Burwell, Civil Action No. H-14-578, 2015 WL 3932657 (S.D. Tex. June 26, 2015) (affirming decision that provider did not comply with LCD documentation requirements); Gordian Med., Inc. v. Sebelius, No. CV 10-1202 CAS (FFMx), 2012 WL 781596 (C.D. Cal. Mar. 9, 2012) (same). Plaintiff in essence questions the fairness of LCD L29253's documentation requirements, but Plaintiff was on notice of these requirements before the services at issue were provided.[19] Additionally, the Court rejects Plaintiff's argument that an LCD may not impose documentation requirements on IDTFs beyond those contained in 42 C.F.R. § 410.33. That section is not couched in terms of documentation requirements, and it does not purport to provide all of the documentation requirements for IDTFs or to preclude

---

[19] Moreover, of course, "fairness" is not the test here.

Contractors from requiring additional documentation to support medical necessity.[20]  The

Secretary's interpretation of LCD L29253 will not be disturbed.[21]

### C.    Substantial Evidence

Finally, Plaintiff purports to argue that the Secretary's finding of a lack of medical

necessity is unsupported by substantial evidence.  However, in this vein Plaintiff argues

that the documentation it submitted was sufficient in light of its view of what it was required

to submit—not that the Secretary erred in its assessment of what documentation was

actually submitted with each claim.  In other words, Plaintiff does not contest that the

documentation that the Secretary found absent from the claim submissions is indeed

absent, and Plaintiff does not bring a true evidentiary challenge.  Substantial evidence

supports the Secretary's conclusion that for each of the sixteen claims at issue, the noted

documentation is missing.

## IV.   Conclusion

The Secretary's findings are supported by substantial evidence, and in the

assessment of the sixteen claims at issue the correct legal standards were applied.

Accordingly, it is **ORDERED** as follows:

---

[20] Plaintiff cites the Ninth Circuit's KGV decision in support of the proposition that 42 C.F.R. § 410.33(d) provides all of the documentation requirements that are applicable to IDTFs.  KGV does not stand for such a principle, however.  The KGV appellate court mentioned the requirements set forth in § 410.33(d) but did not declare them to be exclusive.  Moreover, the KGV district court decision noted documentation requirements imposed by an LCD.  See KGV Easy Leasing Corp. v. Sebelius, No. CV 08-06281 DSF (RZX), 2010 WL 342598, at *4 (C.D. Cal. Jan. 29, 2010). The Ninth Circuit did not mention the LCD in its decision.

[21] The Court is not unsympathetic to Plaintiff's position as a service provider who is not in possession of all of the required documents, but the Court notes that for nearly half of the twenty-seven claims at issue here Plaintiff was indeed able to provide documentation in accordance with LCD L29253 sufficient to establish medical necessity.

1.    Plaintiff's Motion for Summary Judgment[22] (Doc. 28) is **DENIED**.

2.    The Secretary's Motion for Judgment on the Pleadings, or in the Alternative, Cross Motion for Summary Judgment (Doc. 29) is **GRANTED**.

3.    The decision of the Secretary is **AFFIRMED**.

4.    The Clerk is directed to enter a judgment providing that the decision of the Secretary on Plaintiff's Medicare claims is affirmed.  The Clerk shall then close this case.

**DONE** and **ORDERED** in Orlando, Florida, on March 3, 2016.

JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record

---

[22] As at least one other district court has noted, "[m]otions for summary judgment are not, in a technical sense, the proper procedure in matters such as this.  The applicable statutory provisions limit judicial review to an examination of the pleadings and the transcript of the record."  Whitman v. Weinberger, 382 F. Supp. 256, 258 n.1 (E.D. Va. 1974).  This Court established a briefing schedule early in the case, (see Docs. 23 through 25), but the parties nevertheless presented their filings as summary judgment motions.